In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00146-CV
_____

TBS BUSINESS SOLUTIONS USA, INC.
AND TEWODROS "TEDDY" SAHILU, Appellants

V.

ALLCO, LLC, Appellee

On Appeal from the 58th District Court
Jefferson County, Texas
Trial Cause No. A-207,203

## MEMORANDUM OPINION

The Texas long-arm statute authorizes a Texas court to exercise jurisdiction over a nonresident defendant in a lawsuit when the defendant does business in Texas.[1] The plaintiff sued the defendants, a California-based business and individual who were both residents of California, alleging they did business in Texas and the long-arm statute

_____

[1]Tex. Civ. Prac. & Rem. Code Ann. § 17.042.

1

authorized the court's exercise of jurisdiction over them in Texas. The defendants appeared through a special appearance, challenging the plaintiff's claim that a Texas court could enter a judgment that would bind them because the trial court lacked jurisdiction over their persons.

After hearing the defendants' special appearance, the trial court found it had jurisdiction over the defendants and denied the defendants' special appearance. Later, at the plaintiff's request, the trial court reduced its findings and conclusions supporting its ruling to writing. In its written findings, the trial court found that the defendants "routinely sell and distribute products" in Texas, and concluded the exercise of jurisdiction over them in the suit would not "offend traditional notions of fair play[.]"

The defendants, TBS Business Solutions USA, Inc. and Tewodros "Teddy" Sahilu, its Chief Executive Officer, filed a timely, joint notice of appeal after the trial court signed an order denying their special appearance.[2] On appeal, the appellants filed a brief raising four issues to support their arguments claiming the trial court's order should be

---

[2]*Id.* § 51.014(7) (authorizing the interlocutory appeal of a district court's ruling that grants or denies a special appearance).

reversed. First, they argue that Allco failed to plead jurisdictional facts sufficient to show they are subject to the jurisdiction of courts in Texas. Second, they contend that because the litigation involves the plaintiff's contract with a business located in Texas rather than a contract between the plaintiff and TBS, a company incorporated with its principal place of business in California, the pleadings and evidence reveal the claims the plaintiff brought against them are not substantially connected to the operative facts of the litigation. Third, they argue the trial court's exercise of jurisdiction over them offends traditional notions of fair play and substantial justice. And fourth, they contend the trial court erred in concluding Sahilu's unsworn declaration, which they used to verify their Special Appearance, was noncompliant with the requirement of Rule 120a that special appearances be made by "sworn motion[.]"[3]

To resolve the appeal, we must decide whether the appellants, both of whom are residents of California, did business in Texas under the Texas long-arm statute, and if so whether the trial court's exercise of jurisdiction over them complies with the requirements of due process. For

_____

[3]Tex. R. Civ. P. 120a(1).

the reasons explained below, we conclude the trial court erred in denying the special appearance. We reverse the trial court's order, render judgment granting the special appearance, and remand the case to the trial court with instructions to dismiss TBS and Sahilu from the suit.

## Background

After the Coronavirus (Covid-19) pandemic began, Allco, LLC ordered one million N95 masks manufactured by the 3M Company from a Texas-based business, Global Management Services, LLC, a medical supply business and authorized distributor of 3M masks. Allco ordered the masks from Global on March 31, 2020. To secure Global's delivery of the masks, Allco sent Global a deposit of $870,000 toward the $2,900,000 Global charged for the masks. Allco transferred $870,000 to Global's bank account via a wire transfer.

Global, which apparently didn't have 3M masks in stock contacted TBS, another authorized 3M distributor in California, seeking a source of 3M, N95 face masks. On March 31, April 1, and April 6, 2020, Global sent TBS three purchase orders for 3M masks. These three orders (had the masks been delivered) would have allowed Global (had Global complied with its agreement with Allco) to fulfill its agreement with Allco

and supply Allco with one million 3M masks. When Global sent TBS these orders, TBS knew Global had agreed to sell Allco one million 3M masks; even so, TBS disputed that it was a party to the agreement between Global and Allco.

In all, the three purchase orders Global sent TBS, discussed above, represent orders for 5.6 million N95 face masks manufactured by 3M. The purchase orders show that Global expected to pay $5,423,250 for the 5.6 million masks. TBS accepted the three orders, and Global wired TBS $5,423,250 to pay for them. But after receiving Global's money, TBS informed Global that it could not fill the orders through 3M. At Global's request, TBS turned to Makrite Industries Inc., an alternate supplier of N95 masks, to supply Global with N95 masks manufactured by Makrite, not by 3M.

To account for the change in manufacturers and the fact the Makrite masks were nearly three times more expensive, Global sent TBS a fourth purchase order, dated August 13, 2020. In that order, Global ordered 1,000,000 Makrite N95 masks for $2,850,000. On August 19, 2019, Global's president, Roger Morgan, signed TBS's Purchase Order Acknowledgment/Acceptance form, which is the same form that Global

5

had signed when TBS acknowledged it accepted Global's previous three orders. After TBS received the N95 masks from Makrite, pursuant to the terms of Global's purchase order, TBS shipped the masks to Global by delivering them to a ground carrier so they could be delivered to Global in Texas. And since Global had previously sent TBS around $5.4 million to pay for orders TBS couldn't fill with mask made by 3M, TBS applied approximately $2.8 million of the $5.4 million Global had deposited to the price TBS charged Global for the Makrite masks, refunding approximately $2.6 million to Global.

Turning to Allco's petition, Allco alleged that Global never sent it any masks and that the defendants kept Allco's $870,000 deposit even though Allco demanded a refund. When negotiations among the parties about refunding Allco's $870,000 failed, Allco sued Global, Global's president (Roger Morgan), TBS, and Sahilu on nine claims: common-law fraud, fraud by nondisclosure, conversion, statutory theft, breach of contract, promissory estoppel, quantum meruit, vicarious liability, and civil conspiracy.

After Allco sued, Morgan and Global failed to appear or to file answers to Allco's suit. So Allco defaulted Global and Morgan. That said,

6

after they were served, TBS and Sahilu appeared, and they filed a combined Special Appearance and answer. The appellants supported their Special Appearance with an unsworn declaration, signed by Teddy Sahilu. In their Special Appearance, TBS and Sahilu (the appellants) alleged that they are not residents of Texas, that TBS is incorporated and has its principal place of business in California, and that TBS entered a contract to sell face masks to Global, not to TBS. In his unsworn declaration, Sahilu explained that TBS has no offices in Texas, that the communications with Global were by phone or by email from TBS's office in California, and that he and TBS did not performed any of the work related to TBS's transactions with Global in Texas.

In TBS's sworn motion, TBS alleged that when TBS determined it couldn't fill Global's orders with 3M masks, it partially filled Global's request with N95 masks manufactured by Makrite Industries based on Global's instructions to do so. To account for the change in Global's order of masks, Global sent TBS a new purchase order and ordered one million Makrite Industries N95 masks for $2.85 million. Based on that order, TBS ordered the masks from Makrite Industries and charged Global for the masks, crediting the cost of the order for Makrite masks against the

deposit it received from Global for the 3M masks and refunding the balance due Global, around $2.6 million.

In their special appearance, the appellants alleged they had not purposefully availed themselves of the privilege of conducting business in Texas, and they listed specific facts, which generally speaking explain why. Even though the trial court found Sahilu's declaration defective, we note the appellants alleged in their Special Appearance that "[t]he incident on which the suit against TBS and Mr. Sahilu is based did not occur in Texas, and TBS and Mr. Sahilu have had no contacts with Texas in connection with this lawsuit, except to send the Makrite masks to Global via interstate commerce."

In response to the Special Appearance, Allco argued the trial court could exercise specific jurisdiction over its suit because the appellants, in selling the masks, "had actual knowledge that the Makrite masks . . . were shipped to Texas." Second, Allco claimed that by contracting with Global—a Texas distributor—TBS should have reasonably expected the masks would enter Texas. Allco concluded the exercise of personal jurisdiction over TBS would not offend traditional notions of fair play

8

because contracts with Texas residents to supply face masks are of "great interest to the state of Texas."

When the trial court heard the special appearance, no one testified or asked the trial court to consider evidence not already attached to the pleadings on file.[4] Following the hearing, the trial court denied the Special Appearance in a written order. Based on Allco's request, filed nearly a month after the hearing, the trial court issued Written Findings of Fact and Conclusions of Law. In its request for findings, Allco asked the trial court to find that Sahilu's declaration was defective "because it did not state that the facts set out in the pleadings were true and correct." Yet before requesting findings, Allco had never before pointed to any defects in Sahilu's declaration. After Allco requested and drafted proposed findings of fact and conclusions of law, the trial court rubber stamped Allco's proposed findings and conclusions. In finding the facts, the court found:

---

[4]Other than the pleadings on file when the hearing occurred, the documents before the trial court when the hearing occurred are attached either to Plaintiff's Original Petition, Plaintiff's Response in Opposition to Special Appearance, and the combined Special Appearance and Answer.

1. TBS Business Solutions USA, Inc. and Teddy Sahilu have sold and delivered medical supplies and equipment to Global Management Services, LLC, a Texas company located in Stafford, Texas that routinely sell and distribute products in the State of Texas. *See* Affidavit of Roger Morgan.

2. Global Management Services, LLC ordered the 3M masks at issue in this case from TBS Business Solutions USA, Inc., which some were destined for end use in the State of Texas. *See* Affidavit of Roger Morgan.

3. Teddy Sahilu indicated to Roger Morgan that he knew that products sold to Global Management Services, LLC would be for end use in the State of Texas. *See* Affidavit of Roger Morgan.

4. Roger Morgan has personal knowledge that TBS Business Solutions USA, Inc. had a reasonable expectation that products distributed to Global Management Services, LLC would enter the stream of commerce in the State of Texas. *See* Affidavit of Roger Morgan.

5. TBS Business Solutions USA, Inc. shipped Makrite masks directly to Houston, Texas as a part of this litigation. *See* Affidavit of Roger Morgan.

6. Global Management Services, LLC and Roger Morgan have coordinated with Texas OrthoSolutions, LLC and end users in the State of Texas regarding purchasing equipment that is distributed by Global Management Services, LLC and these products enter into the stream of commerce in Texas. *See* Affidavit of Ryan Armstrong.

7. TBS Business Solutions USA, Inc. and Teddy Sahilu have done business with another (unnamed) Texas company in a June 2020 transaction in which they contracted to sell

thermometers and isolation gowns to a company in Irving, Texas. *See* Declaration of Tewodros "Teddy" Sahilu.

Relying on the above, the trial court then reached these six conclusions.

1. Defendants purposefully availed themselves of the privilege of conducting activities within Texas and the claims against them in this litigation resulted from injuries arising from their contacts with Texas.

2. The exercise of personal jurisdiction over Defendants do not offend traditional notions of fair play and substantial justice.

3. Defendants have sufficient minimum contacts with Texas such that the exercise of jurisdiction is fair and reasonable.

4. Defendants also knew or reasonably anticipated that their activities in Texas would render it foreseeable that they may be "hailed into court" here.

5. Defendants knew that some of their products were in or would wind up in Texas and intentionally acted to serve Texas with these products.

6. The Declaration of Tewodros "Teddy" Sahilu, attached to Defendants' Special Appearance, did not verify the special appearance as required by Texas Rules of Civil Procedure 120(a), as it was defective because it did not state that the facts set out in the pleadings were true and correct.

11

## Standard of Review

A nonresident defendant may object to the court's authority to exercise jurisdiction over the defendant's person or property by filing a special appearance meeting the requirements of Rule 120a.[5] Under Rule 120a, the trial court must decide the special appearance on "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony."[6] In deciding the motion, a trial court may consider evidence and resolve disputed issues of fact tied to resolving whether the trial court has personal jurisdiction over the nonresidents who have challenged the court's jurisdiction over them by filing a special appearance.[7] When, as here, the trial court denies the defendants' special appearance and issues findings of fact and conclusions of law to support its ruling, the findings may be challenged on appeal on legal or factual sufficiency grounds.[8] We review a trial

---

[5]*See* Tex. R. Civ. P. 120a; *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 240 (Tex. 2004).

[6]Tex. R. Civ. P. 120a(3).

[7]*BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

[8]*Id.*

court's conclusions of law as legal questions.[9] Even though a party may not challenge a trial court's conclusions of law on grounds of factual insufficiency, they may challenge a conclusion of law as incorrect.[10] Should we determine that a conclusion of law is erroneous but despite the error the trial court reached the correct ruling, the error—if the trial court reached the right ruling anyway—would not require a reversal.[11]

Texas courts may exercise jurisdiction over nonresident defendants if the pleadings and evidence show the following:

- the Texas long-arm statute applies and authorizes a Texas court to decide the case; and
- the court's exercise of jurisdiction over a nonresident defendant comports with the constitutional guarantees of due process.[12]

In its brief, Allco argues because the evidence before the trial court shows specific jurisdiction exists over the defendants for its claims, the trial court properly denied the special appearance. But the appellants question whether the trial court has the authority to bind them to a judgment, an issue that hinges on whether they have "the 'minimum

---

[9]*Id.*
[10]*Id.*
[11]*Id.*
[12]*Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016).

contacts' necessary to create specific jurisdiction."[13] The minimum contacts "necessary to create specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation."[14] "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."[15]

Specific jurisdiction exists if the plaintiff's claims arise from or relate to the defendant's purposeful contacts with the forum where the plaintiff sued.[16] "A claim arises from or relates to a defendant's forum contacts if there is a substantial connection between those contacts and the operative facts of the litigation."[17] This standard "does not require proof that the plaintiff would have no claim but for the contacts, or that the contacts were a proximate cause of the liability."[18] "Instead, we look at what the claim is principally concerned with, whether the contacts will

---

[13]*Walden v. Fiore*, 571 U.S. 277, 283 (2014).
[14]*Id.* at 284 (cleaned up).
[15]*Id.*
[16]*Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 73 (Tex. 2016); *see also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007).
[17]*TV Azteca v. Ruiz*, 490 S.W.3d 29, 52 (Tex. 2016) (cleaned up).
[18]*Id.* at 52-53 (cleaned up).

be the focus of the trial and consume most if not all of the litigation's attention, and whether the contacts are related to the operative facts of the claim."[19]

The parties bear shifting burdens of proof in the hearing on the special appearance.[20] Under the burden-shifting standard, the plaintiff must plead sufficient facts to bring the nonresident defendant within the reach of the Texas long-arm statute.[21] If the plaintiff's pleadings do not show the plaintiff's claims fall under the long-arm statute, "the defendant need only prove that it does not live in Texas to negate jurisdiction."[22] On the other hand, should the plaintiff plead facts sufficient to show the defendant committed a tort or did business with the plaintiff and that the business conducted in the State satisfied the requirements of due process, the burden shifts to the defendant to negate the well-pled allegations.[23]

---

[19]*Id.* at 53 (cleaned up).
[20]*Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010)
[21]*Id.*
[22]*Id.* 658-59.
[23]*See id.* at 659.

Since the petition defines the scope of the lawsuit, "the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's petition.[24] The defendant may "negate jurisdiction on either a factual or a legal basis."[25] "Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations[,]" and on presenting evidence that it has no contacts the burden shifts to the plaintiff to respond with evidence "affirming its allegations" to avoid having the suit dismissed.[26] Or the defendant may present a legal defense by showing

> that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. One way the defendant may show the trial court cannot exercise jurisdiction over the defendant's person is by showing that it has had no contacts with the forum.[27]

---

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

Analysis

*The Unsworn Declaration*

Since deciding whether Sahilu's Special Appearance met the requirements of Rule 120a is a threshold issue, we must determine whether the trial court erred in reaching that conclusion before we address the appellants' remaining issues.[28] On appeal, relying on *Casino Magic Corp. v. King,* Allco argues the trial court could have denied the appellants' special appearance because the appellants failed to verify the jurisdictional facts in their special appearance as true and correct, a requirement of Rule 120a.[29] But even were Allco correct that Sahilu's declaration failed to verify the jurisdictional facts in the Special Appearance (and it isn't, as we later explain), defects in forms used to support a special appearance may be cured if the opposing party objects.[30] But here, Allco didn't object to any alleged defects in Sahilu's declaration until after the hearing occurred; instead, it waited until nearly two weeks

---

[28]*See* Tex. R. Civ. P. 120a(1).

[29]*Casino Magic Corp. v. King,* 43 S.W.3d 14, 18 (Tex. App.—Dallas 2001, pet. denied).

[30]*See Dawson-Austin v. Austin,* 968 S.W.2d 319, 322 (Tex. 1998) (noting that even the lack of a verification to support a special appearance is curable under Rule 120a).

17

after the trial court denied the appellants' Special Appearance, pointing the alleged defect out for the first time when it asked the trial court to conclude that because Sahilu's declaration was defective, the declaration failed to verify the Special Appearance.

To be sure, Sahilu's Declaration lacks a jurat. So even though Allco never complained the Declaration lacks a jurat, the Declaration Sahilu filed does not function as an affidavit.[31] But even had Sahilu intended to file an affidavit and left off the jurat, an affidavit filed without a jurat is a defect that is subject to the rule of waiver since Rule 120a allows special appearances to "be amended to cure defects."[32] In other words, Allco waived any errors in Sahilu's declaration by never objecting to it until after the trial court ruled on the appellants' Special Appearance.

And even if Sahilu intended to file an unsworn declaration, and in our view that's what he intended, his unsworn declaration (absent a timely objection to its form) made the appellants' Rule 120a Special Appearance a "sworn motion" under Texas law. Under section 132.001 of

---

[31]*See* Tex. Gov't Code Ann. § 312.011(1);

[32]Tex. R. Civ. P. 120a(1); *Mansions in the Forest, L.P. v. Montgomery Cty.*, 365 S.W.3d 314, 317 (Tex. 2012); *Dawson-Austin*, 968 S.W.2d at 321-22.

the Civil Practices and Remedies Code, an unsworn declaration transforms a special appearance into a sworn motion.[33] With exceptions not applicable here, section 132.001(a) provides: "[A]n unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law."[34]

Given the above, the trial court's conclusion that Sahilu's declaration didn't verify the Special Appearance because (in the trial court's opinion) it was defective is legally incorrect and unsupported by the record. The record shows that Sahilu did verify the facts in the appellants' Special Appearance. He declared:

> I am a Defendant in the above-referenced lawsuit. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. **I have also reviewed the Special Appearance filed by me and Defendant TBS Business Solutions USA Inc. ("TBS") in the above-referenced lawsuit, and according to my personal knowledge, the facts stated therein are true and correct. (emphasis added).**

---

[33] Tex. Civ. Prac. & Rem. Code Ann. § 132.001.
[34] *Id*. § 132.001(a).

19

For all these reasons, we hold the trial court erred in concluding that Sahilu's Declaration "did not verify the special appearance" as required by Rule 120a.

*Specific Jurisdiction*

In their first issue, the appellants argue that Allco failed to plead jurisdictional facts showing their connection with Texas. According to appellants, the "only jurisdictional allegations in [Allco's] Original Petition are conclusory statements that '[t]he court has personal jurisdiction over Defendants because Defendants engaged in business in Texas by contracting with a Texas resident' and 'Defendants committed torts, which are the subject of this suit, in whole or in part in Texas.'" Were those the only allegations relevant to the trial court's jurisdictional inquiry, we would agree that alone they cannot support the trial court's ruling.[35] But they don't stand alone. When deciding a special appearance,

---

[35] *E.g., Doe v. Univ. of N. Tex. Health Sci. Ctr.*, No. 02-19-00321-CV, 2020 Tex. App. LEXIS 2817, at *8 (Tex. App.—Fort Worth Apr. 2, 2020, pet. denied) ("[A] plaintiff does not meet the burden to plead facts affirmatively demonstrating jurisdiction with conclusory allegations; as we have held, if conclusory allegations were sufficient, 'the jurisdictional inquiry would become meaningless.'") (quoting *City of Forest Hill v. Cheesbro*, No. 02-18-00289-CV, 2019 Tex. App. LEXIS 1572, at *5 (Tex.

the court's jurisdictional inquiry is not limited to one paragraph of the pleadings. Instead Rule 120a requires the jurisdictional inquiry to encompass the factual allegations in "the pleadings . . . and such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony."[36] So even though the appellants focus on one paragraph of the Plaintiff's Original Petition to argue Allco's pleadings of jurisdictional facts were insufficient, the trial court was not free to ignore the remaining allegations of fact in Allco's thirteen-page-long Original Petition or the factual allegations in Allco's thirteen-long-page Response in Opposition to Special Appearance. When considering the matters encompassed by Rule 120a, we conclude the pleadings and evidence, if taken as true, are sufficient to show the trial court was authorized on the pleadings, had the pleadings been undisputed, to exercise specific jurisdiction over at least one of Allco's nine claims.

---

App.—Fort Worth Feb. 28, 2019, no pet.) (mem. op.)); *McLane v. Thomas*, No. 03-18-00439-CV, 2020 Tex. App. LEXIS 1964, at *20 (Tex. App.—Austin Mar. 6, 2020, pet. denied) ("[C]onclusory allegations are not sufficient to overcome sovereign immunity.").

[36]Tex. R. Civ. P. 120a(3).

In issue two, the appellants contend their contacts with Texas are insufficient under the pleadings and evidence before the trial court to establish that the trial court could exercise specific jurisdiction over them in the suit. As to Allco's claims, the parties do not dispute that on March 31, 2020, Global agreed to sell Allco one million N95 face masks manufactured by 3M for $2,900,000. To secure the sale, Allco sent Global $870,000 in advance as a deposit toward its purchase of the masks. Global, an authorized distributor of 3M masks, contacted TBS, a business incorporated in California with its principal place of business there, to fill orders Global was receiving from its customers, customers that included Allco, for N95 face masks manufactured by 3M.

The evidence shows that between March 31, 2020, and August 13, 2020, Global sent four Purchase Orders to Allco for face masks. The first three of these orders were for 3M masks, but the last order on August 13, 2020, was for N95 masks made by Makrite Industries, which Global told TBS to order after learning that TBS couldn't fill Global's first three purchase orders for 3M masks even though Global had already paid TBS in advance for those orders and before TBS delivered the 3M masks that were ordered.

In its petition, Allco alleged the "Defendants represented to [Allco] that they were ready, willing, and able to provide the N95 masks upon receipt of payment[.]" But there were no facts alleged about where TBS or Sahilu allegedly made those representations to Allco. Simply put, Allco alleged no facts claiming that Sahilu or any employees of TBS were in Texas when these representations were made. And the facts Sahilu swore to in his special appearance—that its business with Global was all by phone or email from California—was undisputed. More than a decade ago, the Texas Supreme Court rejected the "directed a tort" approach and the "effects test," the very tests Allco asked the trial court to apply (and the court appears to have applied based on its findings of fact) in ruling on the defendants' special appearance.[37]

Next, we turn to the jurisdictional evidence attached to Allco's pleadings. It shows that Global's relationship concerning both the 3M masks, which weren't delivered, and the Makrite face masks, which were delivered, were with TBS and its managing director, Sahilu. In other

---

[37]*See Old Republic Nat'l Title Ins. Co. v. Bell,* 549 S.W.3d 550, 564-565 (Tex. 2018); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790-792 (Tex. 2005).

words, TBS's and Sahilu's relationships on these transactions were not with Allco, and Allco's evidence does not show otherwise. For instance, every time TBS accepted Global's purchase orders for 3M face masks, TBS sent Global a "Purchase Order Acknowledgement/Acceptance" form, which Global's president, Roger Morgan, signed. Allco is not a party to these agreements. The record contains no contract between TBS and Allco obligating TBS to sell Allco any product, including 3M or Makrite face masks.

Add to that, the following condition is in each of the Acceptance forms that Morgan signed when purchasing 3M masks from TBS:

> As the cases of COVID-19 accelerate across the United States and Canada, 3M is receiving an increasing number of requests for large-volume supply to support the healthcare industry and national preparedness efforts. As a result, order status and shipping dates could fluctuate based on supply. We value your business and patience during this time. This is an evolving situation and we are supplying the best manner possible. We are dedicated to fulfilling all orders in a timely manner.

So the written terms of Global's and TBS's agreements informed Global that TBS's ability to supply 3M masks could fluctuate based on supply and that it would "supply in the best manner possible." That statement reflects TBS would supply customers like Global 3M masks given the

24

demands for them in the "best manner possible," basically a best-efforts term in filling Global's orders. It doesn't show that TBS represented to Global that it had over 5 million N95 masks manufactured by 3M on hand when Global issued the purchase orders in March and April 2020. And while Allco attached an affidavit signed by Global's president, Roger Morgan, to its reply, Morgan never claimed that TBS ever told him that it had millions of N95 face masks manufactured by 3M on hand when he spoke to Sahilu or anyone at TBS. So despite Allco's conclusory allegation claiming "Defendants" represented "they" were ready, willing, and able to supply 3M masks, allegations that are devoid of specifics are insufficient to affirmatively demonstrate how TBS or Sahilu did business or committed a tort in Texas.[38]

We further conclude that the purchase orders attached to Allco's pleadings show that Global, a Texas business, reached into California by ordering face masks under an order requiring TBS to ship the masks to it by a common ground carrier so that Global could then use the masks

---

[38] *See Doe,* 2020 Tex. App. LEXIS 2817, at *8; *Cheesbro,* 2019 Tex. App. LEXIS 1572, at *5; *McLane,* 2020 Tex. App. LEXIS 1964, at *20.

in its business to fulfill its own agreements with its customers.[39] In other words, TBS would have discharged its obligations under the purchase orders for the 3M masks (had it obtained and delivered the masks) on handing the masks to a common carrier in California, regardless of whether California or Texas law were to apply to these three unfilled purchase orders.[40] Our conclusion that TBS's obligations would have been discharged upon delivering the masks in California is reinforced by the fact that Global left the box labeled "F.O.B. POINT" in the purchase-orders blank. The term F.O.B. is a commercial term, which is defined by California and Texas law as "free on board."[41] Thus, under Global's purchase orders, the parties to the contract anticipated that the risk of loss of the goods involved in the transaction passed to Global when TBS delivered the masks to a common carrier in California, meaning the

---

[39]Cal. Com. Code § 2509(1)(a) (Deering, Lexis Advance through Chapter 138 of the 2022 Regular Session); Tex. Bus. & Com. Code Ann. § 2.509(a)(1).

[40]*Id.*

[41]Cal. Com. Code § 2319(1) (Deering, Lexis Advance through Chapter 175 of the 2022 Regular Session); Tex. Bus. & Com. Code Ann. § 2.319

purchase orders did not require TBS to perform any part of the work under the purchase orders in Texas.[42]

Given the evidence about the nature of the relationship (or lack thereof) between Allco and TBS as it relates to the purchase orders that lie at the heart of the controversy, the question boils down to whether Allco's claims arise from or relate to TBS's purposeful contacts with the forum where Allco filed suit.[43] The answer is clearly no. Even though the trial court improperly relied on the directed tort and effects test, both of which tests have been rejected by the Texas Supreme Court, Allco led the court into the error. Just because TBS knew the masks would end up in Texas is insufficient without more than is shown in this record to support the trial court's conclusion that it had specific jurisdiction over TBS or Sahilu because a product TBS sold ended up in Texas.[44]

To support the exercise of specific jurisdiction over a defendant, the jurisdictional evidence or allegations in the pleadings must establish the

---

[42]*Id.*

[43]*Cornerstone Healthcare Grp. Holding, Inc.*, 493 S.W.3d at 73; *see also Moki Mac*, 221 S.W.3d at 576.

[44]*See Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010); *see also Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 107 (1987) (plurality opinion).

nonresident defendant engaged in conduct sufficient to demonstrate the nonresident defendant reached beyond its own state, created a continuing relationship with the resident of the other state, and the suit is related to the nonresident's activities.[45] Examples of conduct that show a nonresident purposefully availed itself of a benefit or advantage in the forum where the suit was filed include: (1) designing the product for the market in the forum; (2) advertising for business in the forum; (3) establishing channels for providing its customers with regular advice in the forum; and (4) marketing products through a distributor who serves as the nonresident's sales agent in the forum.[46] Allco's pleadings do not allege that TBS designed any product, advertised in Texas, or that Global was TBS's sales agent in Texas. And even though the trial court found that TBS and Sahilu "routinely sell and distribute products" in Texas, the trial court based that finding on Roger Morgan's affidavit. But all he said in his affidavit was that "I have ordered medical supplies and equipment from [TBS] in the past, namely 3M respirator masks." While Morgan's affidavit does mention routine sales, he mentions routine sales

---

[45] *Asahi*, 480 U.S. at 112; *Spir Star AG*, 310 S.W.3d at 873.
[46] *Id.*

only in the context of Global's business, not that of TBS: He swore: "My company [Global] has routinely sold and distributed products in the state of Texas for end use in the State of Texas, and thus, said products have entered the stream of commerce in the State of Texas." Even though Morgan may have ordered medical supplies and equipment from TBS and Sahilu in the past, his affidavit fails to show how Allco's claims "arise out of or relate to" TBS's contacts in Texas on a case involving Global's alleged failure to return Allco's deposit of $870,000 and where the relationship between TBS and Global as to the 3M masks Global ordered is a relationship that is centered in California, not Texas.[47]

Here, it appears the trial court focused on the unilateral activity of Global rather than the nonresident's relationship with the forum in ruling on the Special Appearance. But the jurisdictional analysis requires courts to focus on the nonresident's relationship to the forum, not the unilateral activity of a third party.[48] And even when the

---

[47] *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 427 (1985); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009).

[48] *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 9 (Tex. 2021).

nonresident literally has a flood of contacts with the forum, "the exercise of specific jurisdiction is prohibited if the suit does not arise out of or relate to the defendant's contacts with the forum."[49] This concept—that specific jurisdiction is confined to adjudicating issues deriving from or connected with the controversy involved in the lawsuit—which courts refer to as the relatedness inquiry, applies to all of Allco's claims.[50]

The heart of the dispute in the trial court was Global's failure to return Allco's deposit of $870,000. In a sworn motion, the appellants alleged that TBS was not "privy to any of Global's clients' purchase orders or delivery information," an allegation sufficient to shift the burden to Allco to prove Allco was a party to the agreement between TBS and

---

[49]*Id.* at 14 (cleaned up).

[50]*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("[A]n individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum[.]"); *Luciano*, 625 S.W.3d at 14 (noting that a flood of purposeful contacts is insufficient for a court to exercise specific jurisdiction unless there is a nexus between the defendant, the litigation, and the forum); *TV Azteca*, 490 S.W.3d at 46 (comparing the stream-of-commerce cases with the directing-a-tort cases); *Moncrief Oil*, 414 S.W.3d at 152 ("Texas's interest in protecting its citizens against torts is insufficient to automatically exercise personal jurisdiction upon an allegation that a nonresident directed a tort from outside the forum against a resident.").

Global involving Global's purchase of 3M face masks.[51] But the documents Allco attached to its pleadings do not show that Allco was a party to the TBS/Global contract or that TBS was a party to the Allco/Global contract.[52] And during the hearing on the appellants' Special Appearance, in response to a question from the court, Allco's attorney agreed that TBS had returned the money owed to Global after accounting for Global's obligation to pay TBS for delivering to Global one million Makrite N95 masks.

To sum up: The evidence before the trial court shows that TBS and Global conducted their business in California, not in Texas. Allco failed to allege and prove the appellants' contacts with Texas related to and were connected in a substantial way to the facts of the litigation involving the agreement between Global and Allco.

---

[51] *See Kelly*, 301 S.W.3d at 658 (noting the caselaw governing special appearances "dictates that the plaintiff and the defendant bear shifting burdens of proof); *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) ("As a general rule, the benefits and burdens of a contract belong solely to the contracting parties, and no person can sue upon a contract except he be a party to or in privity with it.") (cleaned up).

[52] *See Brumitt,* 519 S.W.3d at 102 (placing the burden of proof on the party who seeks to prove it is a third-party beneficiary to another's contract).

For the reasons explained above, we conclude TBS was not doing business in Texas under the purchase orders Global issued to TBS. We sustain the appellants' second issue. Because resolving the appellants' third issue would not provide appellants more relief, we need not address that issue.[53]

## Conclusion

We overrule the appellants' first issue, sustain issues two and four, and conclude we need not reach issue three. We reverse the trial court's order denying the special appearance. We remand the case to the trial court, with instructions that the trial court dismiss and then sever the claims against the appellants, TBS Business Solutions USA, Inc. and Tewodros "Teddy" Sahilu, from the claims against any other parties to the suit.

REVERSED AND REMANDED.

_____
HOLLIS HORTON
Justice

Submitted on November 4, 2021
Opinion Delivered September 15, 2022
Before Golemon, C.J., Horton and Johnson, JJ.

---

[53]Tex. R. App. P. 47.1. (requiring opinions to address each issue that is necessary to resolving the appeal).